**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 95-10969

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TIMOTHY NEWMAN BROWN,

and

TRACY ALEXANDER BROWN,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Texas

December 23, 1996

Before GARWOOD, DAVIS, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Timothy Newman Brown ("Tim") and Tracy Alexander Brown ("Tracy") were convicted by a jury of their peers on all counts of a six count indictment, which included conspiring to possess with intent to distribute crack cocaine and using and carrying firearms during and in relation to drug trafficking crimes. Tim was sentenced to imprisonment for a total of 624 months. Tracy was sentenced for a total of 270 months. Both defendants appeal their convictions. For the following reasons, we reverse and remand for a new trial Tim and Tracy's convictions on Count 6, as well as Tim's conviction on Count 3. We affirm the convictions and sentences on all remaining counts.

**FACTS**

On January 11, 1995, Officers Tommy Salmon and Tommy Ray of the Shallowater Police Department were driving on U.S. Highway 84 in Lubbock County, Texas, when Officer Salmon noticed that the driver of a black Astro van approaching from the opposite direction was not wearing his seatbelt and that the van's inspection sticker was expired. Officer Salmon turned his patrol car around, activated the overhead lights, and stopped the van.

Officer Salmon noticed that there were several people in the van and radioed for backup. He approached the van and asked the driver, Marcellus Briggs, for his driver's license and insurance information. When Briggs failed to produce proof of insurance, Officer Salmon asked Briggs to step to the rear of the van and issued Briggs a citation for the seatbelt and insurance violations. After Briggs signed the citation, Officer Salmon asked Briggs if there were any illegal drugs, weapons, or other contraband in the vehicle, to which Briggs replied that there were not. Officer Salmon then asked Briggs if he could search the van. Briggs told the officer that the van did not belong to him, but to Tracy, who was sitting in the front passenger seat at the time.[1]

Officer Salmon asked Tracy if there were any illegal drugs, contraband, guns, or large amounts of cash in the vehicle. Tracy replied that there were not, lifting up a styrofoam cooler and stating that they had only alcoholic beverages. When Officer Salmon asked Tracy for consent to search his van, Tracy stepped out and said, "Go ahead." Officer Salmon asked the passengers to step out of the van and to step back toward the patrol car where Officer Ray was standing. The other passengers of the van included Tim, who had been sitting in the middle seat, and Sonny Ector and Dewayne Brown, both of whom had been sitting in the back seat.

In the course of Officer Salmon's search of the van, the following items were found: a razor blade in the drink tray between the seats; a pipe in the glove compartment that had the odor of burnt marihuana; a brown paper bag that contained an electronic scale and a large number of zip-lock bags under the front seat where Tracy had been sitting; a loaded twelve-gauge shotgun under the middle seat where Tim had been sitting; a small baggie containing marihuana, rolling papers, and a roach clip

---

[1]The van was registered in the name of one Irashunda Brown, Tracy's wife.

necklace under the rear seats; a bandolier-type shotgun sling containing several rounds of shotgun ammunition in the right armrest console; four baggies containing a total of 23.30 grams of marihuana and a clear plastic bag containing 190.69 grams of crack cocaine, all found underneath the shotgun sling; five small baggies containing a total of 5.98 grams of crack cocaine in the head liner above the back seat; and a loaded .357 caliber magnum revolver and a loaded .40 caliber semi-automatic pistol under the rear seat.

Officers Salmon and Ray immediately arrested all five passengers of the van and transported them to the Texas Department of Public Safety where they were questioned by investigator John Waits.[2]  Waits questioned Briggs, Tracy, and Tim.  Tracy admitted that he owned two of the weapons, the .357 caliber revolver and the twelve gauge shotgun.  Tim told Waits he knew the drugs were in the van and that their were planning to drive to Clovis, New Mexico.  Tim and Briggs stated that the drugs belonged to Tracy and that he was traveling to Clovis to sell the drugs.

Tim and Tracy were charged by superseding indictment as follows:  both defendants were charged with conspiring to possess with intent to distribute 50 grams or more of crack cocaine in violation of 21 U.S.C. § 846 (Count 1); Tim was charged with possessing with intent to distribute 50 grams or more of crack cocaine in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(A)(iii) and 18 U.S.C. § 2 (Count 2); Tim was charged with using and carrying firearms during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) & (2) (Count 3); Tracy was charged with possessing with intent to distribute 5 grams or more of crack cocaine in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(A)(iii) and 18 U.S.C. § 2 (Count 4); both defendants were charged with possessing with intent to distribute 50 grams or more of crack cocaine in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(A)(iii) and 18 U.S.C. § 2 (Count 5); and both defendants were charged with using and carrying firearms during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) & (2) (Count 6).

---

[2]All five occupants were read their Miranda warnings at the time of arrest and before they were questioned by Waits.

Prior to trial, both Tim and Tracy filed motions to suppress evidence seized from the van. After hearings were held, the court denied the motions by written order.

The government's witnesses at trial included, among others, Briggs and Jowisa Pop, Tim's girlfriend. Briggs testified that on several occasions he had accompanied Tim and Tracy on their road trips to Clovis to sell crack cocaine and that Briggs had sold crack cocaine for Tim and Tracy for about a year. Pop testified that Tim and Tracy sold crack cocaine from her house, that Dewayne Brown and Briggs also sold crack cocaine from her house, and that she had sold crack cocaine supplied by Tim and Tracy. In addition to the witnesses' testimony, the government had other evidence of Tim and Tracy's drug dealings. In particular, the government presented to the jury drug evidence seized during various police searches of the defendants' homes, which were conducted before the January 11 van search.

A jury found both defendants guilty on all counts. Tim was sentenced to imprisonment for 324 months as to Counts 1, 2, and 5, to run concurrently; 60 months as to Count 3, to run consecutively to the sentence imposed on Counts 1, 2, and 5; and 240 months as to Count 6, to run consecutively to the sentences imposed in Counts 1, 2, 3, and 5. Tracy was sentenced to imprisonment for 210 months as to Counts 1 and 5, to run concurrently; 60 months as to Count 4, to run concurrently to the sentence imposed on Counts 1 and 5; and 60 months as to Count 6, to run consecutively to the sentences imposed in Counts 1, 4, and 5.

**DISCUSSION**

We are here presented with several points of error raised by the defendants. First, both defendants challenge the police stop and search of the van. Second, Tim challenges the district court's application of the U.S. Sentencing Guidelines ("guidelines"). Third, both defendants allege jury misconduct. Finally, both defendants challenge the sufficiency of the evidence on various counts.

**I. Stop and Search of the Van**

The defendants make three arguments regarding the police search of the van: (A) the initial police stop of the van was invalid because, according to the law in some circuits, no

reasonable officer under those circumstances would have made such a stop; (B) even if the initial stop was valid, the U.S. Constitution required the police officers to inform the defendants that the detention for the traffic violations had concluded before requesting permission to search the van; and (C) even if the initial stop was valid and the Constitution does not require "informed consent," the search was unlawful because Tracy did not voluntarily give Officer Salmon consent to search the van.

With respect to arguments (A) and (B), when reviewing a district court's rulings on a motion to suppress, we review findings of fact for clear error and questions of law *de novo,* viewing the evidence in the light most favorable to the government, unless inconsistent with the trial court's findings or found to be clearly erroneous after considering the evidence as a whole. *United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir. 1993). As to argument (C), we examine the voluntariness of a consent search by examining the totality of the circumstances under a clear error standard of review. *United States v. Zucco*, 71 F.3d 188, 191 (5th Cir. 1995), *cert. denied*, ___ U.S. ___, 117 S. Ct. 91 (1996).

A.    <u>The police officers' initial stop of the van for traffic violations was lawful.</u>

Defendants argue that this Court should adopt the Fourth Amendment views shared by the Ninth, Tenth, and Eleventh Circuits, which hold that because the police may be tempted to use commonly occurring traffic violations as means of investigating violations of other laws, the Fourth Amendment test for traffic stops is whether a reasonable officer would have stopped Tracy's van for the purpose of enforcing the traffic violations at issue. In this case, defendants argue, the police officers' stop of Tracy's van for violations of the traffic laws was unrelated to the drug search and, therefore, must be considered unlawful because the stop was used as pretext for discovering possible drug activity.

We have consistently rejected this argument, *see United States v. Causey*, 834 F.2d 1179, 1184 (5th Cir. 1987) (en banc), and under the recent decision in *Whren v. United States*, 116 S.Ct. 1769, 1774-76 (1996) (decided after defendants filed their first set of briefs), the Supreme

Court unanimously agreed with this Court's treatment of the issue. As neither defendant contends that the police officers in this case had no probable cause to stop the van for traffic violations, defendants' pretext argument fails.

B.     The Fourth Amendment to the U.S. Constitution does not require police officers, who lawfully stop a motorist for traffic violations, to inform the motorist that the legal detention has concluded before the officers can obtain a valid consent to search the vehicle.

Tracy adopts Tim's argument that even if the initial stop for traffic violations was lawful, the officers were required to inform Tracy that the traffic violation stop had concluded before they could ask for consent to search the van.[3] In the alternative, Tracy maintains that even if the officers were not required to obtain "informed consent," the consent was not voluntary.[4]

In the recent decision of *Ohio v. Robinette*, ___ U.S. ___, ___ S. Ct. ___, 1996 WL 662461 (1996), a case with facts similar to those presented by the Browns' appeal, the Supreme Court held that the Fourth amendment does not require that a lawfully seized defendant be advised that he is "free to go" before his consent search will be recognized as voluntary. In *Robinette*, a police officer pulled over the defendant's car for violation of the speed limit. After giving an oral warning, the officer asked the defendant whether he was carrying any illegal contraband in his car, such as weapons or drugs, to which the defendant answered "no." The officer then asked for permission to search the car, and the defendant gave his consent. During

---

[3]Tim attempts to make the same argument in his brief; however, contrary to his belief, he does not have standing to challenge the search of the van. This Court reviews *de novo* the legal question of whether a defendant has standing to challenge an allegedly illegal search as violative of the Fourth Amendment. *United States v. Riazco*, 91 F.3d 752, 754 (5th Cir. 1996). Although a passenger of a stopped vehicle does have standing to challenge the initial stop and seizure as unconstitutional, *see supra* section I-A, a passenger without a possessory interest in a vehicle lacks standing to complain of its search because his privacy expectation is not infringed. *See United States v. Roberson*, 6 F.3d 1088, 1091 (5th Cir. 1993), *cert. denied*, 114 S.Ct. 1322 (1994); *see also Riazco*, 91 F.3d at 754; *Jackson v. Vannoy*, 49 F.3d 175, 176 (5th Cir.) (per curiam), *cert. denied*, 116 S.Ct. 148 (1995); *United States v. Harrison*, 918 F.2d 469, 472 (5th Cir. 1990). In any event, even if Tim does have standing to challenge the search, the district court did not err in denying his motion to suppress because of the reasons mentioned in this opinion's sections I-A and I-B.

[4]Tracy's argument that the van search exceeded the scope of a *Terry* stop essentially mirrors the argument that Tim makes regarding *Ohio v. Robinette, infra*.

the course of the car search, the officer found a small amount of marihuana in the car's console and a methylenedioxy methamphetamine pill in a clear plastic container. *Id.* at \*1-2.

The defendant was charged with violating R.C. 2925.11(A). He filed a motion to suppress, and at the suppression hearing, testified that he felt he was free to leave after the officer gave him the oral warning about the speeding violation and returned his driver's license to him. The trial court denied the motion to suppress. The defendant later entered a no contest plea and was found guilty of drug abuse.

The appellate court reversed the conviction, and the Ohio Supreme Court affirmed the reversal. The four-justice majority held that the search of the defendant's car was invalid because it was the product of an unlawful seizure. The court explained that, while the decision to stop the defendant for speeding had been justified, once the officer returned to the defendant's car after checking his license, "every aspect of the speeding violation had been investigated and resolved." *Ohio v. Robinette*, 653 N.E.2d 695, 697 (Ohio 1995). And, the court held, "[w]hen the motivation behind a police officer's continued detention of a person stopped for a traffic violation is not related to the purpose of the original, constitutional stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some separate illegal activity justifying an extension of the detention, the continued detention constitutes an illegal seizure." *Id*. In so holding, the court emphasized that it was adopting a bright-line test, requiring police officers to inform motorists that their legal detention has concluded before the police officer may engage in any consensual interrogation. The court explained:

> "The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow. . . .
>
> Most people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them. The police officer retains the upper hand and the accouterments of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away as the officer continues to address him. . . .

7

[C]itizens stopped for traffic offenses [must] be clearly informed by the detaining officer when they are free to go after a valid detention, before an officer attempts to engage in a consensual interrogation. Any attempt at consensual interrogation must be preceded by the phrase 'At this time you legally are free to go' or by words of similar import." *Id*. at 698-99.

The U.S. Supreme Court rejected the Ohio Supreme Court's *per se* rule as directly undermining the U.S. Supreme Court's prior decisions which preclude any adoption of a *per se* rule to replace the totality-of-the-circumstances analysis. The Supreme Court explained:

"We have previously rejected a *per se* rule very similar to that adopted by the Supreme Court of Ohio in determining the validity of a consent to search. In *Schneckloth v. Bustamonte* it was argued that such consent could not be valid unless the defendant knew that he had a right to refuse the request. We rejected this argument: 'while knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of effective consent.' And just as it 'would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning,' so too would it be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary.

The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and 'voluntariness is a question of fact to be determined from all the circumstances.' The Supreme Court of Ohio having held otherwise, its judgment is reversed. . . ." *Robinette*, ___ U.S. at ___, ___ S. Ct. at ___, 1996 WL 662461 at *3 (internal citations omitted).

In sum, the *per se* rule advanced by the defendants has been rejected by the U.S. Supreme Court and, accordingly, is rejected by this Court.

C.      Tracy Brown voluntarily consented to the police search of his van.

Tracy contends that, *Robinette* notwithstanding, under the totality-of-the-circumstances test it is clear that his consent was not voluntary. Specifically, Tracy claims--by adopting the relevant arguments in Tim's brief--that under the test set forth by this Court in *United States v. Phillips*, 664 F.2d 971, 1023-24 (5th Cir. 1981), *cert. denied*, 102 S.Ct. 2965 (1982), Tracy's consent to search the van was not voluntarily given.

"[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 2048

8

(1973). In addition "[w]here the judge bases a finding of consent on the oral testimony at a suppression hearing, the clearly erroneous standard is particularly strong, since the judge had the opportunity to observe the demeanor of the witnesses." *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir.), *cert. denied*, 508 U.S. 944 (1993).

In *Phillips*, this Court announced six factors to be considered in deciding whether consent to search is obtained voluntarily. These factors include (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *Id*. at 1023-24; *see also Kelley*, 981 F.2d at 1470. All of these factors are relevant; however, no single factor is dispositive. *Zucco*, 71 F.3d at 191 n.14.

Here, the district court did not clearly err in concluding based on the totality of the circumstances that Tracy's consent to search was voluntary. Tracy's custodial status was voluntary in that Officer Salmon did not request consent until after the traffic stop had concluded; there was no evidence of any coercion by either officer; Tracy was cooperative with the officers, as evidenced by, among other things, his decision to step out of the van and telling Officer Salmon to "go ahead" and search the van; and Tracy seemed to have the ability to understand and communicate competently with the officers. Although Tracy probably did not know he had the right to refuse consent and likely knew of the incriminating evidence hidden in the van, based on the totality-of-the-circumstances, Tracy's consent was voluntarily given. *See United States v. Watson*, 423 U.S. 411, 424 (1976) ("[T]he absence of proof that [the defendant] knew he could withhold his consent, though it may be a factor in the overall judgment, is not to be given controlling significance.")

**II. Tim's Sentencing Challenge**

Tim argues that the district court erred by increasing his sentence under the guidelines based on his possession of firearms when he had already been convicted for the underlying crime

of using or carrying the same firearms. He attempts to support his argument by pointing to the court's statement, made during the sentencing hearing, that it was adopting the four-level increase recommended by the Presentence Report (PSR) because of Tim's leadership role in the criminal activity and his possession of firearms during the drug trafficking offense. Because the district court ultimately increased his sentence by four levels, Tim believes that the district court must have increased his sentence by two levels under § 3B1.1(c) (leadership role) and by two levels under § 2D1.1(b)(1) (firearms possession) of the guidelines.[5] Thus, as the argument goes, his sentence increase under § 2D1.(b)(1) cannot stand because he had already been convicted of the substantive crime of using or carrying the same firearms during and in relation to the drug trafficking crime. *See United States v. Washington*, 44 F.3d 1271, 1280 (5th Cir.) (recognizing that "a sentencing court may not enhance a drug trafficking sentence based on a defendant's possession of a firearm if the defendant also is convicted under § 924(c) for the possession of that *same* firearm.") (emphasis in original), *cert. denied*, 115 S.Ct. 2011 (1995). This Court reviews the district court's application of the guidelines *de novo*, but will reverse factual findings made during sentencing only if they are clearly erroneous. *Id*.

Based upon a careful review of the record, we reject the defendant's interpretation of the district court's sentencing procedure. Tim has crafted a computation method that would invalidate his sentence; then, he argues backwards that the district court used this impermissible method to impose the four-level increase. Nevertheless, a more plausible explanation exists as to why the court imposed the four-level increase. Stated simply, the court adopted the PSR's recommendation. The PSR recommended that Tim receive a four-level increase in offense level under § 3B1.1(a) of the guidelines, which calls for an increased sentence where the defendant was an organizer or leader of a criminal activity that involved five or more participants or was

_____

[5]Section 3B1.1(c) provides for a two-level increase if the defendant was an organizer, leader, manager, or supervisor in any criminal activity that did not involve five or more participants or was not otherwise extensive. Section 2D1.1(b)(1) authorizes a two-level increase if a dangerous weapon, including a firearm, was possessed during or in relation to a drug trafficking offense.

otherwise extensive. In so doing, the PSR expressly denounced any increase based upon possession of a firearm, stating that "[a]s the defendant has been convicted in Counts 3 and 6, Possession of a Firearm During and in Relation to a Drug Trafficking Crime, a 2 level adjustment for Possession of a Firearm will not be applied." Tim Brown's PSR ¶ 25 at 6. Thus, although it may be true that the court decided to adopt the four-level increase recommended by the PSR partly because of Tim's possession of firearms during and in relation to the drug trafficking crime, nothing in the record indicates that the district court specifically used § 2D1.1(b)(1) to calculate the four-level increase.

## III. Peremptory Challenge Argument

Both defendants claim that their right to exercise meaningfully their peremptory challenges was denied or impaired when a member of the jury (Townsend) unintentionally failed to disclose during voir dire that she graduated from high school with Agent Earnest Dishman, a government witness. We review a district court's refusal to grant a mistrial for an abuse of discretion. *United States v. Layne*, 43 F.3d 127, 134 (5th Cir.), *cert. denied*, 115 S.Ct. 1722 (1995).

To obtain a new trial based on a juror's failure to disclose information during voir dire, "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only the reasons that affect a juror's impartiality can truly be said to affect the fairness of the trial." *McDonough Power Equipment Inc. v. Greenwood*, 104 S.Ct. 845, 850 (1984).

In *United States Ortiz*, 942 F.2d 903 (5th Cir. 1991), *cert. denied*, 112 S.Ct. 2966 (1992), the defendants contended that they were entitled to a new trial because a juror had failed, despite being asked during voir dire, to inform the court that both his cousin and his sister were employees of the U.S. Attorney's Office. During jury deliberations, a secretary with the U.S. Attorney's Office in Brownsville, Texas notified the prosecutor that she had recognized one of the jurors as her cousin and that the juror had a sister who held a clerical position with a U.S.

11

Attorney's Office in a different city. After the jury verdict, the trial court questioned the juror, who stated that he thought his cousin who worked in the U.S. Attorney's Office actually worked for the Customs Bureau and that, although he knew his sister worked for a prosecutor's office in Houston, he did not know "what they do or what their job is or anything like that." *Id.* at 909. Moreover, the juror claimed that "he and his sister had never discussed her occupation, that he had not considered her in any way related to the prosecution, and that neither her nor his cousin's vocation bore upon his impartiality during deliberations." *Id.*

On appeal, this Court held that the defendants failed to meet the requirements of the *McDonough* two-pronged test. Importantly, the Court found that the juror's "post-verdict dialogue with the district court suggests that he answered the voir dire query honestly yet inaccurately, something *McDonough* . . . expressly permits." *Id.* at 909.

In the instant case, neither defendant satisfies the *McDonough* standard as juror Townsend did not deliberately withhold information and there is nothing in the record to indicate actual bias on her part. Neither the prosecutor nor the defendants knew of Townsend's inadvertent failure to disclose her "familiarity" with Agent Dishman until after voir dire. When questioned by the trial judge in chambers, Townsend stated that she had not seen Agent Dishman since high school, that the fact that she went to high school with Agent Dishman would not have any bearing upon her being a fair and impartial juror, and that she believed she could still continue to serve as a fair and impartial juror. Counsel for both defendants, although given the opportunity to question Townsend, declined to do so. Hence, we find that the defendants' peremptory challenge argument fails.

## IV. Sufficiency of the Evidence Challenges

A.   There was sufficient evidence to convict Tracy Brown on Count 1 for conspiracy to possess with intent to distribute crack cocaine and on count 5 for possession with intent to <u>distribute crack cocaine.</u>

Tracy contends that there was insufficient evidence to support a conviction on Count 1 for conspiring to possess with intent to distribute 50 grams or more of crack cocaine and on Count 5

for possession with intent to distribute 50 grams or more of crack cocaine. We review challenges to the sufficiency of the evidence by considering all of the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found all the elements of the offense beyond a reasonable doubt. *United States v. Gonzales*, 79 F.3d 413, 423 (5th Cir. 1996), *cert. denied*, No. 96-165, 1996 WL 442681 (Oct. 7, 1996). Direct and circumstantial evidence are given equal weight, and the evidence need not exclude every reasonable hypothesis of innocence. *Id*.

To establish a drug conspiracy under 21 U.S.C. § 841(a)(1) and § 846, the government must prove the existence of an agreement between two or more persons to violate federal narcotics laws; the defendant's knowledge of the agreement; and the defendant's voluntary participation in the agreement. *Id*. Mere presence at the scene of the crime or close association with co-conspirators will not alone support an inference of conspiracy but are factors that the jury may consider in finding conspiratorial activity. *Id*. As to the sufficiency of the evidence to support Tracy's conviction on Count 5, the elements of this offense are possession, knowledge, and intent to distribute. *Id.*; *see also United States v. Crooks*, 83 F.3d 103, 106 (5th Cir. 1996).

Here, the evidence in the record sufficiently supports Tracy's convictions on Count 1 and Count 5. In addition to the physical evidence seized during the search of Tracy's van and the presence of Tracy's co-conspirator in the van, there was considerable testimony at trial that supports Tracy's convictions. Briggs testified that, on several occasions, he accompanied Tim and Tracy to Clovis, New Mexico for the purpose of selling crack cocaine. Briggs also testified that Tracy possessed firearms on two of those trips, that Briggs sold crack cocaine from Tracy's house for a year, and that Briggs, Tim, and Tracy loaded Tracy's van on the morning of January 11, 1995, the date of the seizure of crack cocaine found in the van. Briggs' testimony was corroborated by the testimony of Pop, Tracy's girlfriend. Pop testified that, among other things, Tim and Tracy sold crack cocaine from her house and that she sold crack cocaine furnished by

13

Tim and Tracy either directly or through Briggs. Also, photographs seized during a search of Tracy and Tim's house displayed Tim, Tracy, Sonny Ector and Dewayne Brown holding firearms.

B.    The evidence was not sufficient to convict Tim Brown on Count 3 or either defendant on Count 6, using and carrying a firearm during and in relation to a drug trafficking crime, in light of the Supreme Court's recent decision in *Bailey v. United States.*

Tim asserts that there was insufficient evidence to support his conviction on Count 3, and both defendants complain that there was insufficient evidence to support their convictions on Count 6. Tim contends that pursuant to the Supreme Court's recent decision in *Bailey v. United States*, 116 S.Ct. 501 (1995), this Court must vacate his conviction on Count 3 because the two firearms that were found in a closet in proximity to drugs and drug proceeds can no longer be considered sufficient evidence to support a conviction under 18 U.S.C. § 924(c).[6] Both Tim and Tracy rely on *Bailey* in arguing that their convictions on Count 6 should be reversed and, at the very least, a new trial should be granted to allow the government to prosecute them under the "carry" theory only.

In *Bailey*, two defendants were convicted under § 924(c)(1) in separate cases. Defendant Bailey was stopped by the police for a traffic offense and arrested after the police found cocaine in the driver's compartment of his car. The police also found a firearm inside a bag in the locked car trunk. Defendant Robinson, whose case was consolidated with Bailey's, had her home searched by the police who, during the search, found an unloaded, holstered firearm locked in a footlocker in a bedroom closet. There was no evidence that either Bailey or Robinson employed the firearms in any way.

In reversing and remanding both convictions, the Supreme Court held that the term "use," as it appears in § 924(c)(1), denotes active employment of a firearm. Active employment includes

---

[6]On August 26, 1994, pursuant to a valid search warrant, the police searched a house leased to Patricia Ford Manning, Tim's girlfriend. In the closet in the master bedroom, officers found a portable metal safe that contained drugs and $5,601 in currency. There were also two MAK-90 assault rifles with drum magazines beside the safe, along with Tim's driver's license and birth certificate. Appellant Tim's Brief at 7. These firearms were the basis of Tim's conviction and sentence on Count 3.

14

brandishing, displaying, bartering, striking with, reference to, and firing or attempting to fire, a firearm. *Id*. at 508. The Court rejected the government's argument that "use" includes placing the gun nearby to provide a sense of security to or embolden an offender, such as placing a gun in a nearby closet. Indeed, the Court found that even in a situation where an offender conceals a gun nearby to be at the ready for an imminent confrontation, this does not constitute "use" of a firearm unless the gun is disclosed or mentioned by the offender.[7] *Id*.

In the present case, the government concedes that, under *Bailey*, Tim's conviction on Count 3 should be reversed. Appellee's Brief at 33. However, the government believes that both defendants' convictions under Count 6 should be remanded for a new trial on the "carrying" theory only. Appellee's Brief at 34. Relying on this Court's recent decision in *United States v. Fike*, 82 F.3d 1315 (5th Cir.), *cert. denied*, No. 96-5403, 1996 WL 442557 (Oct. 7, 1996), the government maintains that a remand for a new trial is appropriate on the single issue of "carrying," as applied under § 924(c), because the evidence sufficiently supports a jury finding that the defendants carried firearms during or in relation to their drug trafficking offenses. *See id*. at 1328.

Under the law prior to *Bailey*, the two rifles found in a closet in close proximity to a metal safe containing crack cocaine, proceeds of drug sales, Tim's driver's license, and his birth certificate would have been sufficient evidence to support his conviction on Count 3. In light of *Bailey*, however, these facts are insufficient to meet the requirements set forth by the Supreme Court. Thus, we reverse Tim's conviction on Count 3.

We also reverse the defendants' conviction on Count 6, and remand so that they may be retried on the "carrying" theory. As noted by this Court, the Supreme Court in *Bailey* limited its decision to the interpretation of the term "use," and did not address the "carry" requirement. *United States v. Rivas*, 85 F.3d 193, 195 (5th Cir. 1996). Indeed, because the Court of Appeals

---

[7]The Fifth Circuit has applied *Bailey* to direct appeals, as newly announced rules apply retroactively to criminal cases pending on direct appeal. *See United States v. Rivas*, 85 F.3d 193, 195 n.1 (5th Cir. 1996); *United States v. Andrade*, 83 F.3d 729, 730 (5th Cir. 1996).

in *Bailey* did not consider liability under the "carry" prong of § 924(c)(1) for either defendant, the Supreme Court remanded the case for consideration of that basis for upholding the convictions. *Bailey*, 116 S.Ct. at 509. Thus, *Bailey* did not disturb prior precedent in this circuit analyzing the "carry" prong. As this Court explained in *Rivas*:

> "Prior to *Bailey*, in *United States v. Pineda-Ortuno*, . . . we examined the 'carrying' requirement of § 924(c) and explained that the word 'carry' derives from the french carier, which means 'to transport in a vehicle.' (*quoting* WEBSTER'S THIRD INTERNATIONAL DICTIONARY 353 (1966)). Webster's provided the following definitions of 'carry': 'to move while supporting (as in a vehicle or in one's hands or arms): move an appreciable distance without dragging: sustain as a burden or load and bring along to another place.' *Id.* We observed that the legislative history did not indicate that the word 'carry' should be given any meaning but its ordinary or literal meaning. Significantly, we also recognized that carrying on the person is different from carrying in a vehicle 'because the means of carrying is the vehicle itself.' Thus, we held that the 'carrying' requirement of § 924(c) is met 'if the operator of the vehicle knowingly possesses the firearm in the vehicle during and in relation to a drug trafficking crime." *Id.* at 195-96 (internal quotations and citations omitted).

*See also Fike*, 82 F.3d at 1328 (stating that "[i]n placing a gun under the driver's seat of a car, then driving the car to another location, one has carried the gun according to Webster's definition. This, in our view, satisfies § 924(c)'s carrying requirement"). In the present case, the evidence demonstrates that both Tim and Tracy "carried" firearms with them in the van while transporting the drugs. Although only "use" was defined, the jury was instructed that in order to convict they had to find that the "defendant under consideration knowingly used or carried a firearm during and in relation to" his commission of the underlying drug offense. *See* Appellant Tim's Brief at 32 n.14. As in *Fike*, it is unclear whether the jury convicted the defendants under the "use" or "carry" prong.

## CONCLUSION

For the foregoing reasons, we REVERSE and REMAND for a new trial Tim and Tracy's convictions on Count 6, as well as Tim's conviction on Count 3. All other convictions and sentences are AFFIRMED.

16