**UNITED STATES of America,**

v.

**Reynaldo PORTILLO–AGUIRRE, Defendant.**

**and**

**United States of America,**

v.

**Maria Julia Portillo–Bringas, Defendant.**

**Nos. P–00–CR–367, P–01–CR–63.**

United States District Court, W.D. Texas, Pecos Division.

Feb. 26, 2001.

James K. Blankinship, Assistant U.S. Attorney, Alpine, TX, for government.

Ray Velarde, El Paso, TX, for defendant Reynaldo Portillo–Aguirre.

Luis E. Islas, El Paso, TX, for defendant Maria Julia Portillo–Bringas.

## ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS

FURGESON, District Judge.

Before the Court are the Motions to Suppress of Defendants Reynaldo Portillo–Aguirre and Maria Portillo–Bringas, both filed February 7, 2001, in the above-styled cases. The Motions assert identical arguments and will accordingly be resolved together. After careful consideration of the briefs and oral arguments at the hearing of February 22, 2001, it is the opinion of the Court that the Defendants' Motions be DENIED.

## INTRODUCTION

This case is part of the continuing legal saga that is the Sierra Blanca immigration checkpoint. The voluminous history of that checkpoint has been detailed elsewhere, *see United States v. Jackson,* 825 F.2d 853 (5th Cir.1987), and need not be recounted here. It is clearly the law in this Circuit that the Sierra Blanca checkpoint is not a border equivalent. *Id.* at 854.

However, it is equally clear that searches and seizures performed by the United States Border Patrol, whether at fixed checkpoints or by roving patrol, are subject to a unique body of Fourth Amendment doctrine. The analysis is governed by four seminal Supreme Court cases. The holdings of those cases may be summarized as follows. A vehicle search by a roving patrol must be based on consent or probable cause. *Almeida–Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). A seizure (stop) of a vehicle by a roving patrol need only be based on specific articulable facts that reasonably warrant suspicion. *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). A vehicle search at a fixed checkpoint must be based on consent or probable cause. *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975). A seizure of a vehicle at a fixed checkpoint for a brief questioning of its occupants, for the purpose of ascertaining citizenship or immigration status, may be conducted without any particularized suspicion that the vehicle may contain illegal aliens. *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). At issue here is whether, or to what extent, the Border Patrol may extend the legitimate seizure of a bus for an immigration check at a fixed checkpoint, and remain on the bus to enquire about the presence of illegal narcotics.

## FACTS

On September 20, 2000, at approximately 10:15 p.m., an Americanos bus pulled

into the Sierra Blanca checkpoint. Border Patrol agents, according to standard practice, began to conduct a canine inspection around the outside of the bus, where the lower luggage bins are located. At the same time, Border Patrol agents Jade Woodruff and Ted Barron boarded the bus. Agent Woodruff testified that such immigration inspections usually take from three to five minutes. According to Agent Woodruff it is extremely common to arrest illegal aliens and make drug seizures on buses at the Sierra Blanca checkpoint. Agent Woodruff also testified that when he boards a bus to perform an immigration inspection he looks for dialect, accent, responsiveness to questioning, body language, nervousness, and reaction to the presence of the Border Patrol. Agent Woodruff testified that these factors can contribute to his forming a suspicion that a passenger may be an illegal alien or be carrying illegal narcotics.

It is also interesting to note that Agent Woodruff testified that the Border Patrol does keep agents apprized of changes in Fourth Amendment law, and that Agent Woodruff's personal observation is that the number of drug seizures in the outside luggage bins has dropped dramatically since the decision in *Bond v. United States*, 529 U.S. 334, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000) invalidated the "squeeze and sniff" search of the overhead luggage racks inside the bus. Agent Woodruff's opinion is that drug smugglers, equally cognizant of developments in case-law, have simply moved the drugs from the

lower luggage bins, where they are exposed to canine inspection, to the inside luggage racks, where detection of the narcotics is more difficult.

Also worthy of note is Agent Woodruff's testimony that less than half of the searches he conducts for illegal narcotics reveal the presence of drugs.

On September 20, 2000, once on board the bus, Agent Woodruff made an announcement that he was going to conduct an immigration inspection of the bus. Agent Woodruff testified that the making of an announcement is his personal *modus operandi*, that Border Patrol has no policy addressing the issue, and that many agents make no announcement at all.[1] Agent Woodruff then walked down the isle to the back of the bus. Ms. Portillo was sitting in the third window seat from the front on the driver's side of the bus. Mr. Portillo was sitting directly behind her. Agent Woodruff testified that Mr. Portillo seemed nervous from the moment Agent Woodruff boarded the bus. This fact is not reflected in Agent Woodruff's report after the arrest, but this Court finds that Agent Woodruff's testimony was credible. Agent Woodruff testified that Mr. Portillo was sitting with his legs straight down and holding a pillow and a book in his lap. Agent Woodruff continued his inspection with the rest of the bus, checked the bathroom at the back of the bus, and began to walk back toward the front of the bus.

While returning to the front of the bus, Agent Woodruff noticed a green duffel bag

---

**1.** It is troubling, to say the least, that the Border Patrol has no official policy on the issue of announcements. One of the critical characteristics that make warrantless immigration inquiries at permanent checkpoints constitutionally permissible is the "regularized manner in which established checkpoints are operated." *Martinez–Fuerte*, 428 U.S. at 559, 96 S.Ct. 3074. It is the opinion of this Court that the Border Patrol should require an agent who conducts the immigration inspection to make an announcement of the purpose of the inspection as soon as that agent boards the bus. A brief announcement advances the principle that constitutional

checkpoints are attended by "visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest." *Id.* This Court offers the following as an example:

"Hello, my name is _____. I am a United States Border Patrol agent. It is the duty of the Border Patrol to ensure that people are in the United States legally. To that end, I am going to conduct an immigration inspection. As I come by, please make sure that you have the appropriate documentation ready for inspection. Thank you very much for your cooperation."

under Mr. Portillo's seat, which could not be seen from the front because of the way Mr. Portillo was sitting. Agent Woodruff then asked Mr. Fortillo if he had any luggage on the bus. In response, Mr. Portillo pointed to a green rucksack in the overhead bin directly above his seat. Agent Woodruff then asked Mr. Portillo if the green duffel bag under the seat was his as well. Agent Woodruff testified that Mr. Portillo indicated that it was, and began to fidget nervously. Agent Woodruff asked what was in the green duffel bag and Mr. Portillo responded that it contained books and clothes. Agent Woodruff then asked if he could look in the bag. Mr. Portillo opened the bag to display its contents to Agent Woodruff. Agent Woodruff testified that the manner in which Mr. Portillo was showing him the contents of the bag led him to believe that Mr. Portillo was attempting to conceal something in the bottom of the bag. Agent Woodruff again asked if he could search the bag himself. Mr. Portillo agreed. Agent Woodruff pushed aside the clothes on top of the bag and immediately saw a brown, tape-wrapped bundle. Agent Woodruff then arrested Mr. Portillo and notified Agent Barron, who escorted Mr. Portillo off the bus.

Agent Woodruff then noticed that there was a blue duffel bag, identical in design to the green duffel bag, under the seat in front of Mr. Portillo, the seat in which Ms. Portillo was sitting Agent Woodruff, not expecting anyone to answer, asked the passengers as a whole whose bag this was. To Agent Woodruff's surprise, Ms. Portillo claimed the bag and pulled it out from under her seat. Agent Woodruff testified that Ms. Portillo never exhibited any nervousness or aroused any suspicion before he discovered the bag under her seat. Agent Woodruff asked Ms. Portillo if he could search her bag. She agreed and opened her bag. Agent Woodruff, without disturbing the contents of the bag, saw brown tape-wrapped bungles in the bag, identical to those he had seen in Mr. Portillo's green duffel bag. Agent Woodruff then arrested her, collected her luggage, and escorted her off the bus. Agent Woodruff testified that the entire stop took about ten minutes.

## ANALYSIS

The question for this Court is whether these actions violated the Portillos' Fourth Amendment protection against unreasonable searches and seizures. Without splitting hairs, the analysis can be usefully broken down into three components: the seizure of the Americanos bus at the Sierra Blanca checkpoint, the continued seizure of the Portillos on board the Americanos bus for the purpose of Agent Woodruff to investigate his suspicion that the Portillos may have been carrying illegal narcotics, and finally the searches of the Portillos' bags.

The first question is easy. *Martinez–Fuerte* clearly allows the seizure of vehicle, without individualized suspicion, for the limited purpose of an immigration inspection. 428 U.S. at 566, 96 S.Ct. 3074. There can be no dispute that the initial seizure of the Portillos, and the rest of the passengers on the bus, was constitutionally permissible.

The second question is much more difficult. The question is, as stated above, whether, or to what extent, the Border Patrol may extend the legitimate seizure of a bus for an immigration check at a fixed checkpoint, and remain on the bus to enquire about the presence of illegal narcotics. The question lends itself to two *kinds* of answer. An answer of yes to the "whether" question necessitates the "to what extent" inquiry. Therefore, this Court will first address the question of whether the Border Patrol may extend the legitimate immigration seizure to enquire about drugs. Once having found that such an extension is within the Border Patrol's authority, this Court can then attempt to resolve the question of the permissible bounds of that extension.

The authority of Border Patrol to establish permanent checkpoints, effectuate roving patrol stops, and interrogate persons concerning citizenship status is derived from the powers enumerated in 8 U.S.C. §§ 1357(a)(1) & (a)(3). The Supreme Court has held that "[a]ll these operations are conducted pursuant to statutory authorizations empowering Border Patrol agents to interrogate those believed to be aliens as to their right to be in the United States and to inspect vehicles for aliens." *Martinez–Fuerte,* 428 U.S. at 553 n. 8, 96 S.Ct. 3074. Accordingly, the authority of the Border Patrol is defined not only by the Constitution and Fourth Amendment caselaw, but by the statutes which enumerate its power.

■■■ Although the primary duty of the Border Patrol is the enforcement of immigration law, Border Patrol agents have limited authority to (1) make arrests in the enforcement of the Controlled Substances and the Controlled Substances Import and Export Act; (2) conduct warrantless searches for evidence incident to the arrest in the enforcement of the Acts; and (3) make seizures of the controlled substances and/or property pursuant to the provisions of the Acts. *United States v. de La Rosa–Valenzuela,* 993 F.Supp. 466, 468 (W.D.Tex.1997) (stating the scope in which United States Border Patrol agents are authorized to enforce narcotics laws as a result of their cross-designation by the Attorney General pursuant to 21 U.S.C. §§ 873(b) & 965). In this context, if a Border Patrol agent discovers evidence of a narcotics violation during a lawful immigration stop, the agent is allowed to act upon that evidence. *United States v. Muniz–Melchor,* 894 F.2d 1430, 1437 (5th Cir.1990) (citation omitted) ("[t]he law does not require the police to ignore evidence of other crimes in conducting legitimate roadblocks."). If an agent develops an articulable suspicion that a person may be transporting narcotics during the course of his immigration inspection, he may act upon that suspicion. As this Court has noted in a previous opinion, "an agent can, and should be, very vigilant in trying to ferret out illegal activity within the confines of the law." *United States v. Espinoza–Santill,* 976 F.Supp. 561, 570 (W.D.Tex.1997). However, the limited powers to make arrests for narcotics violations is not a freestanding power. That is, a Border Patrol agent may make such an arrest only "if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(5).

Satisfied that the Border Patrol does have the authority to extend an immigration seizure for the purpose of narcotics investigation, this Court can now address the issue of the permissible bounds of such an investigation in a vehicle stopped at a fixed checkpoint. The Supreme Court has said "[a]ny further detention ... must be based on consent or probable cause," *Martinez–Fuerte,* 428 U.S. at 567, 96 S.Ct. 3074 (citations omitted). The Fifth Circuit, even more explicitly, has written that "in every one of its many checkpoint and roving patrol cases, the Supreme Court has restricted the level of government intrusion to brief detentions only long enough to ask questions and check citizenship status." *Jackson,* 825 F.2d at 862. In that case, the Fifth Circuit, in a candid exposition worth repeating, wrote:

> We might question whether limiting officers at permanent checkpoints to brief questioning of motorists frustrates law enforcement efforts.... If removing the government's plenary power to search at permanent checkpoints does actually diminish effective enforcement of the immigration laws, the Fourth Amendment balance between the government intrusion and the individual's privacy right under these circumstances has been struck by the Supreme Court in *Martinez–Fuerte,* and that is dispositive of the issue for us. *Id.*

This is the law of the land: searches at Sierra Blanca must be supported by either consent or probable cause. However, Defendants in this case argue that even before the search of the bag took place, the Border Patrol violated the Portillos' Fourth Amendment protection against an unreasonable *seizure* by staying on the bus after the immigration check was complete to investigate the possible presence of illegal narcotics.

The issue seems ripe for adjudication, especially in light of the recent Supreme Court case of *City of Indianapolis v. Edmond,* —— U.S. ——, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). That case held unconstitutional "a highway checkpoint program whose primary purpose is the discovery and interdiction of illegal narcotics." *Id.* at 450, 121 S.Ct. 447. However, the Court explicitly reserved the issue of the constitutionality of an extension of a valid seizure, for the purpose of drug interdiction. *See id.* at 457 n. 2, 121 S.Ct. 447 ("we express no view on the question whether police may expand the scope of a licence or sobriety checkpoint seizure in order to detect the presence of drugs in a stopped car.")

■ Informed by these ambiguities in Fifth Circuit and Supreme Court law, as well as the above-stated problem of the very scope of the Border Patrol's authority, this Court offers the following analysis to address the problem. A Border Patrol agent, legitimately on board a bus to perform an immigration inspection at a fixed checkpoint may extend that seizure to investigate, including the questioning of a passenger, the possibility that illegal narcotics may be aboard only if the agent is aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion. In other words, it is the opinion of this Court that in order for the Border Patrol to continue the seizure of a vehicle at an immigration checkpoint beyond the verification of citizenship or immigration status, the Border Patrol must be held to exactly

the same standard the Supreme Court would require for the Border Patrol to seize a vehicle in a roving patrol stop.

Defendants argue that "[a]ny further detention ... must be based on consent or probable cause," citing *Martinez–Fuerte,* 428 U.S. at 567, 96 S.Ct. 3074. That language is taken from the decision in *Brignoni–Ponce* and is worth reciting in its entirety. "The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on probable cause." *Brignoni–Ponce,* 422 U.S. at 881–82, 95 S.Ct. 2574. *Brignoni–Ponce,* then, at least in part, stands for the proposition that if a Border Patrol agent is aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion, he may seize a vehicle in order to ask an occupant of the vehicle to explain suspicious circumstances. That is exactly what Agent Woodruff did in this case, and the standard of *Brignoni–Ponce* is the exact standard he should be held to, in order to evaluate the constitutionality of his actions. This Court is aware that learned commentators have recently observed that the articulable facts of reasonable suspicion standard is an imperfect one, and may be susceptible to abuse, *see, e.g., United States v. Zapata–Ibarra,* 223 F.3d 281 (5th Cir.2000) (Wiener, J., dissenting). However, it is the current law; and, in the opinion of this Court, it is also the law most applicable to the solution of this problem.

■ Although this should be regarded as an extremely close case, it is the opinion of this Court that Agent Woodruff was able to articulate specific facts that warranted reasonable suspicion that suspicious circumstances were afoot. Agent Woodruff testified that Mr. Portillo was nervous, that the manner in which he was sitting assured that his duffel bag could only been seen from behind, that he initially admitted to only having the one bag in the

overhead compartment, and that he became fidgety and increasingly nervous as the questioning went on. This Court further finds that because the blue duffel bag under Ms. Portillo's seat was of the same design as Mr. Portillo's bag, and located in such close proximity to the first bag, Agent Woodruff had reasonable suspicion to enquire about its ownership and conduct his very brief questioning of Ms. Portillo.

This Court finds that these facts gave rise to reasonable suspicion. Accordingly, this Court finds that the continued seizure of the Portillos did not violate their Fourth. Amendment protection against unreasonable seizures.

This Court can now turn to the third and last of the question to be addressed: the constitutionality of the searches of the Portillos' bags. The law governing this issue is well settled. A search of a vehicle at a checkpoint must be supported by consent or probable cause. *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975). The government argues that the two searches were consensual.

■ Law enforcement officers, without warrant or probable cause, may conduct a search if the individual voluntarily consents to the search. *United States v. Brown*, 102 F.3d 1390, 1395 (5th Cir.1996). The primary inquiry here is whether the defendant's consent to the search is truly voluntary. *Id.* at 1396. Voluntariness is a question of fact to be determined by the totality of the circumstances. *Id.* When the government relies on the consent of the defendant to justify the lawfulness of a warrantless, suspicionless search, it has the burden of proving that the consent was, in fact, freely and voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 221, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

■ The factors considered by the Court in determining voluntariness include: (1) the individual's knowledge of his constitutional right to refuse consent; (2) the age, intelligence, education, and language ability of the individual; (3) the degree to which the individual exhibits the cooperation with police; (4) the individual's apparent attitude about the likelihood of discovery of contraband items; and (5) the level and degree of coercive police behavior as evidenced by the length of detention and the nature of questioning. *Brown*, 102 F.3d at 1396. This list of factors is not exhaustive and no single factor is *per se* dispositive. *Id.*

In this case, Mr. Portillo claimed ownership of the green duffel bag under his seat after Agent Woodruff asked him if the bag was indeed his. Agent Woodruff then asked Mr. Portillo, in Spanish, if he could look in the bag. Mr. Portillo opened the bag to display its contents. Agent Woodruff then asked Mr. Portillo if he could search the bag himself. Again, this request was given in Spanish. Mr. Portillo agreed. It was from this search that the narcotics in question were discovered.

When Agent Woodruff asked Ms. Portillo if he could look in her bag, she immediately and unhesitatingly allowed him to do so.

■ Applying the above facts to the law governing this issue, it is the opinion of the Court that the Portillos voluntarily gave their consent for Agent Woodruff to search their respective bags.

The Court notes that at no time during this encounter were the Portillos told of their right to refuse consent to the requested search. The Supreme Court has found that knowledge of the right to refuse is not required for a defendant's consent to be voluntary. *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (citation omitted) ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent."). However, the Supreme Court has also found that the advisement to a defendant by police of his right to refuse is particularly significant in determining the issue of voluntariness. *Florida v. Bostick*, 501

U.S. 429, 432, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (emphasizing that police specifically advised the defendant of his right to refuse consent in determining whether a reasonable person would feel free to decline the officer's request or to otherwise terminate the encounter); *Muniz–Melchor*, 894 F.2d at 1440 (citation omitted) (recognizing that though knowledge of the right to refuse is not a requirement for a finding of voluntary consent, it is a "central factor in any voluntariness analysis").

This principle finds particular applicability to immigration checkpoints. One critical factor to the Supreme Court's determination that a seizure at a permanent checkpoint did not violate the Fourth Amendment is that passengers and motorists are assured of the government's authority to stop their vehicles. *Martinez–Fuerte*, 428 U.S. at 558, 96 S.Ct. 3074 (*quoting United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975)) ("At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion"). Passengers do not have the right to refuse to answer questions concerning their citizenship or to refuse to produce immigration documentation. As such, it may be unclear to passengers—a significant number of whom may not be United States citizens—whether they may refuse a request to search. Where the boundaries of a law enforcement officer's authority to search is blurred, the person has "no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector himself is acting under proper authorization." *Id.* at 565, 96 S.Ct. 3074 (citation omitted). A verbal advisement of the right not to consent furthers this policy of assuring passengers as to the scope and authority of the Border Patrol's powers at the checkpoint. Accordingly, though not dispositive in this particular case, it must be noted that a simple advisement of the right not to consent would make it much easier for this Court to find valid, voluntary consent in future cases.

## CONCLUSION

This is an exceedingly close case in an exceedingly complicated body of law. The above analysis is merely this Court's best effort at providing a workable solution to this pressing problem. Authoritative guidance from the Fifth Circuit on this issue is vital and this Court encourages appeal.

It is useful, in concluding, to recapitulate this Court's findings. The initial stop at the Sierra Blanca checkpoint was constitutional. That seizure was extended because Agent Woodruff developed a suspicion that Mr. Portillo was smuggling illegal narcotics. This Court finds that Agent Woodruff has articulated facts that reasonably warrant his suspicion. As such, the extension of the initial seizure was constitutional. As a final matter, this Court finds that the inspections of the Portillos' duffel bags were valid, consensual searches. Accordingly, it is the opinion of the Court that the Defendants' Motions to Suppress be DENIED.