UNITED STATES of America

v.

**Paul Preston PERKINS.**

**No. P–00–CR–270.**

United States District Court, W.D. Texas, Pecos Division.

Sept. 25, 2001.

Kelly Wayne Loving, Assistant U.S. Attorney, San Antonio, TX, for the Government.

Merry A. Worley, Odessa, TX, for defendant.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

FURGESON, District Judge.

Before the Court is Defendant's Motion to Suppress filed August 16, 2000, in the above-styled matter. After a hearing, the Magistrate Judge's filed his Proposed Findings of Fact and Recommendation on February 16, 2001. The Defendant filed specific objections to the findings on April 18, 2001. By Show Cause Order entered June 5, 2001, the Court requested additional briefing by the parties concerning the validity of the cross-designation of Border Patrol agents with arrest authority under Title 21. After careful consideration and de novo review, the Court is of the opinion that Defendant's Motion should be DENIED.

## STANDARD OF REVIEW

A district court reviews de novo a magistrate judge's report and recommendations when either party makes specific objections within ten days of receipt of the report. 28 U.S.C. § 636(b)(1). If no ob-jections are filed, the court reviews for findings and conclusions that are either clearly erroneous or contrary to law. *United States v. Wilson*, 864 F.2d 1219 (5th Cir.1989). The Defendant timely filed specific objections and, therefore, this Court conducts a de novo review of the Magistrate Judge's report and recommendations.

## FACTS AND PROCEDURAL HISTORY

At approximately 6:30 a.m. on June 15, 2000, U.S. Customs Agent William Upchurch, a supervisor for U.S. Customs in Presidio, Texas, received a phone call from a confidential informant ("CI"). The CI advised him that a recreational vehicle ("RV") was "being loaded" in Redford, Texas, and would depart Redford by 7:30 a.m. Based on both his law enforcement experience and his experience with this particular CI, Agent Upchurch understood the phrase "being loaded" to mean being loaded with drugs. Agent Upchurch con-sidered the CI to be reliable because he had personally worked with him on several different occasions. According to Agent Upchurch, the CI had provided information in the past that ultimately led to prosecutions in six different cases. Agent Upchurch also testified that U.S. Customs had an on-going relationship with this particular CI and that he still provides information to them.

Except for identifying the loaded vehicle as an RV, the CI failed to describe the RV, its occupants, the precise location of where it was being loaded in Redford, or its destination. Nor did Agent Upchurch inquire into these details. Agent Upchurch then contacted Agent Vince LeValle, a Supervisor Agent with the United States Border Patrol and advised Agent LeValle of the "tip." Next, Agent LeValle contacted Agent Randy Davis and relayed the

information. Agent Davis then contacted Border Patrol agents located both east and west of Redford and of the information provided by the CI and advised them to "be on the look out" for an RV traveling in the area. This type of advisory is commonly referred to as a "BOLO."

Redford, Texas, is located along Farm to Market road 170 ("FM 170"). FM 170 is the only main road in and out of Redford. The road basically follows the Rio Grande River and, thus, parallels the United States/Mexico border. A drive along FM 170 is scenic, making it a popular route for travelers. For most of its length, FM 170 is in very close proximity to the border, often within eyesight from the road. Agents familiar with the area characterize FM 170 as a route often used by smugglers of aliens and/or narcotics to avoid the fixed immigration checkpoint located on Highway 67, just south of Marfa, Texas.

FM 170 is intersected by FM 169, between Redford and Presidio, Texas. This road is commonly known as "Casa Piedras" road. From FM 170, FM 169 runs north and intersects Highway 67, just south of the Marfa Checkpoint. Any vehicle traveling northbound on FM 169 would have to go through the Marfa checkpoint. According to the testimony, though it is possible for an RV to travel on FM 169, it is highly unlikely because of the narrowness of the road and the number of blind turns. Agents also testified that the majority of traffic on FM 169 is from local ranchers. The layout of the roads leads to the inference that an RV traveling east from Redford most likely came through Presidio, near the border, rather than from Marfa, via FM 169.

On the morning of June 15, 2000, Border Patrol Agents Gregory T. McConnell and Edwin Mooreland were on duty east of

Redford on FM 170. At approximately 6:30 a.m., the agents received a call advising them that an RV loaded with marijuana would be departing Redford around 7:00 a.m. Acting on this BOLO, Agents McConnell and Mooreland took up a position just outside of Lajitas in order to observe the traffic on FM 170. After not observing any motorists for about an hour, the agents decided to travel west towards Presidio. At approximately 7:40 a.m. and about five miles west of Lajitas, the agents observed an approaching east bound RV. The RV was towing a small car. It was only the third vehicle that the agents had observed traveling on FM 170 since 1:30 a.m. that morning and the only RV. The agents believed that this RV had started traveling from Redford rather than further west from Presidio for two reasons. First, the agents knew that the Border Patrol had stationed other agents on the west side of Redford pursuant to a "box in" [1] strategy. Second, it was unlikely that the RV had not come from FM 169. The agents, therefore, believed that this RV was most likely the RV identified by the BOLO.

As the RV passed, Agents McConnell and Mooreland observed that one of the RV's safety straps on the towing dolly was loose. During their observation of the vehicle, the strap actually disconnected from the car and fell onto the roadway. The agents observed that another strap also appeared to be loose. However, because of the narrowness of the roadway, the agent did not initiate the stop until Lajitas. Once the RV stopped, Perkins, who was driving, exited the vehicle. Agent McConnell instructed Perkins to get back into the RV. Agent McConnell approached the RV and identified himself as a Border Patrol

---

**1.** A box in strategy is simply the stationing of agents on the main artery leading out of a town.

agent. He then inquired as to Perkins's citizenship. Perkins identified himself as a U.S. citizen and produced identification. By his own testimony, at this point, Agent McConnell was completely satisfied as to Perkins's citizenship status. However, based on the BOLO, Agent McConnell still suspected that the RV was involved in narcotics smuggling. He then inquired as to Perkins's travel plans and informed him of the loose safety straps. Perkins stated that he was coming from Alpine, Texas near Marfa.

Agent McConnell asked Perkins if he could look in the RV. According to Agent McConnell, Perkins gave his consent. Agent McConnell then asked both Perkins and his wife to exit the RV so that they could assist Agent Mooreland in tightening and reattaching the safety straps. Not wanting to enter the RV through the front, where he would have to climb over the driver's seat, he asked if the RV's side door was open for him to enter. According to Agent McConnell, Perkins again gave his consent for him to enter and search the RV. Upon entering, Agent McConnell observed several sugar sacks containing bundles. Based on his experience as a Border Patrol agent, his narcotics training, and the obvious odor, he believed the bundles to contain marijuana. The agents then arrested Perkins and his wife. Field tests confirmed that the bundles contained marijuana.

Defendant Perkins raises several specific objections to the findings of fact of the Magistrate Judge. First, he questions the reliability of the tip provided by the CI. Specifically, Perkins notes that the CI failed to provide several key material details including (1) that the RV in question was towing a small car; (2) how the CI knew that this RV was being loaded with narcotics; and (3) the route that the RV would take from Redford. Next, Perkins challenges Agent Upchurch's assessment that the CI and his information were reliable. Here, Perkins clarifies that though Agent Upchurch testified that he had personally dealt with the informant on six occasions where "cases were made," there was no testimony that the CI's information had actually resulted in a final conviction. Perkins also challenges the Magistrate Judge's characterization of FM 170 and the travelers common to that area.

Perkins also objects to the Magistrate's conclusions of law. First, Perkins asserts that the initial stop of his RV was unconstitutional under the Fourth Amendment. Specifically, he contends that the information provided by the CI was too general and too vague. Therefore, the Border Patrol did not have a reasonable suspicion to justify the seizure of Perkins's RV. Next, he argues that even if the initial seizure was lawful, the continued detention of Perkins after the Border Patrol agents were satisfied of his immigration status was unreasonable, and, therefore, in violation of the Fourth Amendment. Finally, Perkins asserts that he did not give his consent to the search of the RV.

## DISCUSSION

### I. The Initial Stop of Perkins's RV

Perkins's first objection questions the constitutionality of the initial stop of his RV by Border Patrol agents. Agents McConnell and Mooreland acknowledged that they stopped his RV based solely on the BOLO, which advised only of narcotics smuggling. Perkins's objection lends itself to two questions: first, did the Border Patrol agents have the authority to make a roving patrol stop based solely on a suspicion of narcotics smuggling, and second, if the agents did not have authority to make the stop, is suppression the proper remedy?

## A. The limited arrest powers of Border Patrol agents under 8 U.S.C. § 1357(a)(5)

The first question forces an examination of the statutory enforcement and arrest authority granted Border Patrol agents under Title 8 of the U.S.Code. Though its name is somewhat deceptive, the Border Patrol is not charged with patrolling the border for any and all criminal activity and its agents are not general law enforcement officers. *See Ortiz v. United States Border Patrol,* 39 F.Supp.2d 1321, 1326 (D.N.M.1999). Rather, the primary duty of the Border Patrol is the enforcement of immigration laws. Accordingly, the authority of the Border Patrol to seize, question, search, and arrest under Title 8 is narrowly tailored to the performance of this duty. *Id.* ("Border Patrol agents' powers to search and arrest are tightly controlled by statute and regulation, and are focused on their primary mission of interdiction of alien traffic into this country.").

Section 1357(a) identifies the limited investigative and enforcement actions that the Border Patrol may take as INS officers:

Any officer or employee of the Service authorized under regulation prescribed by the Attorney General shall have power without warrant—

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

(2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation ... regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation

and is likely to escape before a warrant can be obtained for his arrest;

(3) within a reasonable distance from any external boundary of the United States, to board and search any vessel ..., or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States;

(4) to make arrest for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens.

These provisions limit Border Patrol authority to the enforcement of immigration laws. Only § 1357(a)(5) gives Border Patrol agents the authority to make arrests for non-immigration felonies. Even this general arrest power, however, is conditioned on the enforcement of immigration laws. Under § 1357(a)(5), Border Patrol agents have the power without warrant:

to make arrests—

(A) for any offense against the United States, if the offense is committed in the officer's or employee's presence, or

(B) for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony,

if the officer or employee is *performing duties relating to the enforcement of the immigration laws at the time of the arrest* and if there is a likelihood of the

person escaping before a warrant can be obtained for his arrest.

8 U.S.C. § 1357(a)(5) (emphasis added).

To be clear, as written, § 1357(a)(5) allows Border Patrol agents to make an arrest for a non-immigration law violation only if the agents are performing duties relating to the enforcement of immigration laws at the time of the arrest. *Ortiz*, 39 F.Supp.2d at 1326. The legislative history of the 1990 amendment codifying § 1357(a)(5) indicates that the circumscription of the Border Patrol's general arrest authority was deliberate. Prior to the amendment, if a Border Patrol agent discovered narcotics or other contraband during an immigration inspection but there was no arrestable immigration offense, then the agent had to rely on state statute or citizen's arrest authority to make the arrest. H.R.Rep. No. 101–681(I), at 414 (1990), 1990 U.S.C.C.A.N. 6472 (discussing the development and structure of Border Patrol agents' general arrest powers). By 1990, Congress recognized the need to address the growing number of non-immigration crimes encountered by Border Patrol agents. However, Congress did not want to create an independent drug enforcement agency; nor did Congress want to compromise the Border Patrol's vital role of enforcing immigration laws. *Id.* In the House Report accompanying the bill amending § 1357(a)(5), Congress enunciates the compromise reached:

> [The amendment to § 1357(a)(5)] grants INS officers general arrest authority, but *such officers will have general arrest authority only if at the time of the arrest the officer was performing immigration duties.* The primary purpose of this restriction is to ensure that INS will not be diverted from its primary duty— the administration of the immigration laws of the United States.

*Id.*, 1990 U.S.C.C.A.N. at 6554 (emphasis added).

In this context, if a Border Patrol agent discovers evidence of a narcotics violation while conducting a lawful immigration stop, then the agent is allowed to act upon that evidence. If, during the course of his immigration inspection, an agent develops an articulable suspicion that a person may be smuggling narcotics, then he may act upon that suspicion. *United States v. Muniz–Melchor*, 894 F.2d 1430, 1437 (5th Cir.1990) (citation omitted) ("[T]he law does not require the police to ignore evidence of other crimes in conducting legitimate roadblocks."); *United States v. Portillo–Aguirre*, 131 F.Supp.2d 874, 879 (W.D.Tex.2001). As this Court has emphasized, "an agent can, and should be, very vigilant in trying to ferret out illegal activity within the confines of the law." *United States v. Espinoza–Santill*, 976 F.Supp. 561, 570 (W.D.Tex.1997).

It is a vastly different situation, however, when Border Patrol agents are conducting roving patrol stops solely for the purpose of investigating possible narcotics smuggling. None of the subsections under § 1357(a) permits Border Patrol agents to perform an investigatory stop of a vehicle for anything other than the enforcement of immigration laws; nor is such a stop made permissible simply because a pro forma immigration inspection is done when the Border Patrol agents have no reasonable basis for believing that a vehicle is carrying illegal aliens. A situation where Border Patrol agents are being diverted from their primary duty of enforcing immigration laws in order to police for narcotics violations or any other federal felonies is exactly the type of situation that § 1357(a)(5) prohibits. H.R.Rep. No. 101–681(I), at 414 (1990), 1990 U.S.C.C.A.N. at 6554 ("The primary purpose of this restriction is to ensure that INS will not be diverted from its primary duty—the administration of the immigration laws of the United States."). Though limitations of

§ 1357(a) handicap the Border Patrol's ability to address the problem of narcotics smuggling, which, at the border, is a problem on par with immigration violations, § 1357(a) expressly restricts Border Patrol agents from acting as general law enforcement officers.

### 1. Border Patrol agents were not performing duties relating to the enforcement of immigration law

■ The Court finds that agents Mooreland and McConnell were not authorized to stop Perkins's RV by §§ 1357(1)–(4) or by the general arrest power of § 1357(a)(5) because the agents were not performing duties relating to the enforcement of immigration laws at the time that they initiated the stop. The evidence and testimony at the hearing establish that the BOLO, which advised only of narcotics smuggling, was the only reason that the Border Patrol agents stopped Perkins's RV. No other factors support a reasonable suspicion that Perkins's RV was involved in an immigration law violation. Though the agents observed several loose safety straps and could have stopped the vehicle for safety reasons, the agents could not stop the vehicle in order to conduct an immigration inspection and/or investigatory stop based solely on the loose straps. Other than the loose straps, the RV was like any other RV traveling on a scenic route early in the morning.

Delineating when a Border Patrol agent is and is not performing duties relating to the enforcement of immigration laws is, at best, problematic. Wherever the line is eventually drawn, the Court finds that on the specific facts presented by this case, the agents were not performing duties relating to the enforcement of immigration laws. Border Patrol agents were called by U.S. Customs agents and were informed that a particular vehicle may be transporting a significant amount of marihuana. The Border Patrol set up units on both

major arteries leading out of Presidio for the purpose of apprehending the crime. Though these actions were a prudent response, the statutory limitations of § 1357(a) bind the hands of the Court. The agents were not performing duties relating to the enforcement of immigration laws when they made the stop. To hold otherwise would effectively do away with the limitation established by § 1357(a)(5).

### B. Alternate sources of narcotics enforcement authority beyond 8 U.S.C. § 1357(a)

The government argues that, despite the limits of § 1357(a), Border Patrol agents have authority to make roving patrol stops based solely on a suspicion of narcotics violations for two reasons: (1) case law authorization of roving patrol stops and (2) the cross-designation of Border Patrol agents by the Attorney General as Drug Enforcement Administration agents. After careful review, the Court disagrees.

#### 1. Case law

A discussion of investigatory stops begins with *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry,* the Supreme Court held that a police officer could perform a limited seizure and search if the officer was aware of specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted a belief that the officer's safety or that of another is in danger. *Id.* at 21, 88 S.Ct. 1868. *Terry* and its progeny have established the principle that the Fourth Amendment allows limited searches and seizures—referred to as *Terry* stops or stops-and-frisks—on facts that do not constitute probable cause justifying an arrest or a full search. 3 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 668 (2nd ed.1982).

In *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607

(1975), the Supreme Court examined the application and scope of *Terry* stops specifically in the context of the Border Patrol and announced the rule that governs the instant case:

> [O]fficers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.

*Brignoni–Ponce*, 422 U.S. at 884, 95 S.Ct. 2574. In applying the general rule announced in *Terry* to the Border Patrol, whose primary duty is the enforcement of immigration laws, the Supreme Court emphasized that "[a]s in *Terry*, the stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" *Id.* at 881, 95 S.Ct. 2574 (quoting *Terry*). As such, the Supreme Court held that where a Border Patrol agent initiates a roving patrol stop because of a reasonable suspicion of an immigration law violation the agent may then only question the driver and passengers about their citizenship status and have them explain any suspicious circumstances. *Id.* at 881–82, 95 S.Ct. 2574. Any further detention must be based on probable cause or consent. *Id.* at 882, 95 S.Ct. 2574.

The current confusion as to whether Border Patrol agents may initiate a roving patrol stop on a suspicion of criminal activity other than immigration law violations stems from the unfortunate misapplication of *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). In *Cortez*, the Supreme Court attempted to clarify the reasonable suspicion test first recognized in *Terry*:

> Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of *criminal activity*.

*Id.* at 417–18, 101 S.Ct. 690 (emphasis added). As the broad language of this passage suggests, *Cortez* was intended to address investigatory stops as applied to law enforcement officers generally. *See* 3 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 668 (2nd ed.1982) (noting that *Cortez* states the current formulation of the standard governing investigatory stops generally). *Cortez* was not intended to broaden the Border Patrol's arrest and enforcement powers beyond the limited authority granted by § 1357(a). In fact, Cortez involved an investigatory stop by Border Patrol agents based solely on a suspicion of alien smuggling.

Since *Cortez* involved an investigatory stop by the Border Patrol, the Fifth Circuit has read the broad language of *Cortez* as standing for the proposition that Border Patrol agents may conduct roving patrol stops to investigate not only suspected violations of immigration laws but *any* criminal conduct. *See, e.g., United States v. Nichols*, 142 F.3d 857, 865 (5th Cir.1998) ("In *United States v. Cortez*, the Supreme Court clarified that the [Border Patrol] agents' suspicion need not be confined to considerations of smuggling undocumented immigrants."). The Fifth Circuit's current formulation of the rule governing when Border Patrol agents may effectuate a roving patrol stop is as follows:

> Border Patrol agents on roving patrol may stop a vehicle if they are aware of

specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that that particular vehicle is involved in *illegal activity.*

*United States v. Villalobos,* 161 F.3d 285, 289 (5th Cir.1998) (emphasis added) (fashioning this rule from *Brignoni–Ponce* and *Cortez* ); *see also United States v. Morales,* 191 F.3d 602, 604 (5th Cir.1999) (citing *Villalobos* as holding that the *Brignoni–Ponce* factors have been "expanded to cover other types of criminal activity in addition to alien trafficking"). Are the "illegal activities" for which Border Patrol agents may investigate limited to illegal activities as defined by federal, state, or municipality law? This is just one question generated by the broad view of *Cortez.*

On reflection, such a broad view seems overly expansive. To allow Border Patrol agents to conduct roving patrol stops to investigate suspected violations of *any and all* criminal laws (including narcotics laws) cannot be justified under *Cortez.* First, such a reading violates the statutory limitations established by 8 U.S.C. § 1357(a): that Border Patrol agents are statutorily authorized to investigate only immigration law matters and that Border Patrol agents may make an arrest for a non-immigration law felony only if the agents are *performing duties relating to the enforcement of the immigration laws at the time of the arrest.* 8 U.S.C. §§ 1357(a)(1) (granting Border Patrol agents the power "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States"); 1357(a)(3) (authorizing agents to "board and search any vessel or vehicle for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States"); 1357(a)(5) (limiting agents' general arrest authority).

Next, such an open ended interpretation of *Cortez* would necessarily allow Border Patrol agents to investigate violations of any law, not just federal narcotics laws, because *Cortez* itself does not distinguish between different types of illegal activity. Many federal agents have only limited arrest powers rather than general arrest powers carried by local or state officers. *See United States v. Sealed Juvenile 1,* 255 F.3d 213, 216 (5th Cir.2001) (recognizing that federal customs agents are not "like local or state police, general guardians of the public peace" because their power to arrest is primarily limited to violations of U.S. customs laws). Likewise, prior to *Cortez,* the Fifth Circuit recognized that the permissible scope of searches and seizures that Border Patrol agents could conduct in executing their immigration law duties is predicated on and therefore circumscribed by their authority to enforce only immigration laws. *United States v. Thompson,* 475 F.2d 1359, 1362 (5th Cir. 1973) (emphasis added) ("Border patrol officers do not have the authority, *under the immigration laws,* however to search bags, containers, or compartments too small to conceal persons."); *see also United States v. Santa Maria,* 15 F.3d 879, 882 (9th Cir.1994) ("Section 1357(a)(3) does not authorize searches for drugs.").

In a more recent example, this Court held that Border Patrol agents do not have authority to stop a vehicle based only on a suspicion that a person is violating a state traffic law. *See United States v. Rubio–Hernandez,* 39 F.Supp.2d 808, 830 (W.D.Tex.1999). The reason is that Border Patrol agents lack the authority to enforce state laws. *Cf. Brignoni–Ponce,* 422 U.S. at 883 n. 8, 95 S.Ct. 2574 (recognizing that "Border Patrol agents have no part in enforcing laws that regulate highway use"); *United States v. Garza,* 544 F.2d 222, 225 n. 3 (5th Cir.1976) (disapproving of a roving patrol stop by Border Patrol agents based solely on a traffic violation but allowing such violation to sup-

port a suspicion that a vehicle is smuggling aliens). Nor did Congress intend for the Border Patrol to police for any and all illegal activities that may occur near the border. Therefore, though a violation of state laws or any other laws may be considered, the sum total of these facts must support a reasonable suspicion of an immigration law violation. *See Garza,* 544 F.2d at 225 n. 3.

To hold otherwise would grant Border Patrol agents unfettered discretion to investigate suspected violations of *any and all* cognizable criminal laws, whether state, federal, and even international laws, so long as the activity could be characterized as "criminal"; it would, in effect, give to the Border Patrol the general police power that the Constitution reserves to the States and that 8 U.S.C. § 1357(a)(5) expressly prohibits. *United States v. Morrison,* 529 U.S. 598, 618 n. 8, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (citation omitted) ("[T]he principle that the Constitution created a Federal Government of limited powers while reserving a generalized police power to the States is deeply ingrained in our constitutional history."); *Ortiz,* 39 F.Supp.2d at 1326 ("Border Patrol agents are not general law enforcement officers."); H.R.REP. No. 101–681(I), at 414 (1990) (expressing the intent that the primary duty of Border Patrol agents is the enforcement of immigration laws).

The Court returns to the fundamental rule governing roving patrol stops by the Border Patrol enunciated in *Brignoni–Ponce:* Border Patrol agents may stop a vehicle to perform an immigration inspection only if they are "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Brignoni–Ponce,* 422 U.S. at 884, 95 S.Ct. 2574. This rule adheres to the limitations of § 1357(a). It also does not conflict with

the Supreme Court's decision in *Cortez.* The issue presented in *Cortez* was not whether Border Patrol agents had authority to conduct roving patrol stops to investigate offenses other than immigration law violations. In fact, *Cortez* involved Border Patrol agents who had stopped a vehicle because they specifically believed that the vehicle was transporting illegal aliens. *Cortez's* clarification of the reasonable suspicion test was intended to elucidate the terms "articulable reasons" and "founded suspicion" as applied to law enforcement officers *in general. Cortez,* 449 U.S. at 417, 101 S.Ct. 690; *see* 3 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 668 (2nd ed.1982) (interpreting *Cortez* as an clarification of the rule governing investigatory stops generally). It was not meant to alter the Supreme Court's specific views of the Border Patrol as federal agents with specialized, limited authority. *See Brignoni–Ponce,* 422 U.S. at 883 n. 8, 95 S.Ct. 2574 (taking into account the "special function of the Border Patrol" and the unique "character of roving-patrol stops" in determining that Border Patrol agents do not have authority to stop cars merely for violations of state traffic laws).

Based on the testimony and evidence at trial, the stop of Perkins's RV was based solely on the BOLO, which advised only of possible narcotics smuggling. There are no specific facts that reasonably support a suspicion of an immigration law violation. The analysis, however, does not end here.

### 2. The cross-designation of Border Patrol agents with Title 21 enforcement authority

A possible source for authority allowing Border Patrol agents to conduct investigatory stops based on a reasonable suspicion of narcotics violations is the limited cross-designation of Border Patrol agents with Title 21 arrest authority. By agreement between the DEA and the INS executed in

1996, Border Patrol agents, who complete certain basic narcotics training, have limited cross-designation under Title 21 to enforce federal narcotics laws. Memorandum of Understanding between the Drug Enforcement Agency and the Immigration and Naturalization Service 5 & Attachment A (March 25, 1996) (on file with the District Court). In addition, since 1996, all newly certified Border Patrol agents are cross-designated with Title 21 arrest authority. The specific authority granted to the Border Patrol under the Memorandum is worth repeating:

> In addition to all authorities conferred to them by any law, statute, or regulation, including 8 U.S.C. § 1357, INS officers receiving limited cross-designation will also be authorized under Title 21 to arrest, conduct searches and seizures incident to arrest, conduct warrantless searches and seizures at Border Patrol checkpoints, process and present the criminal prosecution to the United States Attorney's office and the court, transport prisoners to places of custody, process and transport any seized drugs for DEA laboratory analysis, and complete appropriate paperwork relative to the arrest or seizure, all in accordance with applicable DEA policies and procedures.

A Border Patrol agent cross-designated with Title 21 arrest authority has the power to arrest without warrant for "any felony, cognizable under the laws of the United States, if he has probable cause to believe that the person to be arrested has committed or is committing a felony." 21 U.S.C. § 878(a)(3)(B). Essentially, cross-designation removes the limitation created by § 1357(a)(5) that Border Patrol agents may make an arrest for any felony under United States law only if the agent is "performing duties relating to the enforcement of the immigration laws at the time of the arrest."

The lawfulness of the Attorney General's cross-designation of Border Patrol agents with Title 21 arrest authority has never been directly addressed by any court. The few courts that have commented on this issue have observed that, although the primary duty of the Border Patrol is the enforcement of immigration law, the cross-designation by the Attorney General has conferred upon them authority to enforce federal narcotics laws. *United States v. Soto–Camacho,* 58 F.3d 408, 410 (9th Cir. 1995) (acknowledging that Border Patrol agents are "cross-designated as drug enforcement and customs agents, and are trained to detect drug smuggling as well as alien smuggling"); *United States v. de La Rosa–Valenzuela,* 993 F.Supp. 466, 468 (W.D.Tex.1997) (stating the scope in which United States Border Patrol agents are authorized to enforce narcotics laws as a result of their cross-designation by the Attorney General pursuant to 21 U.S.C. §§ 873(b) & 965).

Now directly confronted by this issue, this Court finds that the Attorney General does not have the authority to cross-designate Border Patrol agents with Title 21 enforcement authority. Title 21 simply does not contain any provision authorizing the Attorney General to vest other federal agents with Title 21 arrest authority. The absence of any such provision is significant because where Congress has intended to allow the cross-designation of federal agencies, it has written provisions expressly allowing for it.

**a. Title 21 does not contain a provision authorizing the Attorney General to designate other federal agents with Title 21 arrest authority.**

 Title 21 is devoid of any provision that purports to allow the Attorney General to cross-designate another federal agency or other non-DEA employees with narcotics law enforcement powers. The

persons authorized to enforce federal narcotics laws are specifically stated in 21 U.S.C. § 878(a):

Any officer or employee of the Drug Enforcement Administration or any State or local law enforcement officer designated by the Attorney General may—

(3) make arrests without warrant (A) for any offense against the United States committed in his presence, or (B) for any felony, cognizable under the laws of the United States, if he has probable cause to be believe that the person to be arrested has committed or is committing a felony.

Section 878(a) reserves this broad arrest power (which includes the power to arrest for any federal narcotics law felony) to officers and employees of the DEA. Border Patrol agents are not employees of the DEA; they are employees of the INS. As such, Border Patrol agents do not carry the broad arrest powers of § 878(a). Nor does § 878(a) provide the Attorney General with the authority to designate to other federal agents that section's arrest power. It only allows the Attorney General to designate State or local officers with such broad arrest powers.

Section 873 of Title 21 also does not provide statutory authority for the cross-designation of Border Patrol agents with Title 21 arrest powers. Section 873(a) identifies the permissible manner through which the Attorney General may structure cooperation between federal agencies for the enforcement of federal narcotics laws and promotion of drug abuse prevention. Under 21 U.S.C. § 873(a), the Attorney General is authorized to:

(1) arrange for the exchange of information between governmental officials concerning the use and abuse of controlled substances;

(2) cooperate in the institution and prosecution of cases in the court of the United States . . . ;

(3) conduct training programs on controlled substance law enforcement with local, State, and Federal personnel.

Noticeably absent from § 873(a) is any provision authorizing the Attorney General to cross-designate other federal agencies with Title 21 enforcement authority.

 Nor can the authority to cross-designate be grounded in § 873(b). Section 873(b) merely grants the Attorney General broad powers to call on the assistance of other federal agencies in the enforcement of federal narcotics laws under Title 21:

When requested by the Attorney General, it shall be the duty of any agency or instrumentality of the Federal Government to furnish assistance, including technical advise, to him for carrying out his functions under this sub-chapter.

21 U.S.C. § 873(b). Even reading "to furnish assistance" liberally, the Court cannot hold that this provision allows the Attorney General to confer upon the Border Patrol—an agency that by statute only has power to enforce immigration law—the authority to enforce narcotics laws. To hold otherwise would necessarily mean that, pursuant to § 873(b), the Attorney General could require *any* agency or instrumentality of the federal government—from the Federal Communications Commission to the President's Council on Physical Fitness—to police for and enforce Title 21 violations whether or not the agency or instrumentality has any such enforcement authority and even if the agency or instrumentality is otherwise precluded BY statute from taking such action. This Court recognizes that an inherent limitation of § 873(b) is that the Attorney General cannot not require the federal agency from which he requests assistance to perform actions that the agency does not already

have the authority to perform or is otherwise prohibited from performing; § 873(b) is not a means for the Attorney General to augment the authority of the federal agencies beyond their respective statutory limitations.

### b. Where Congress has intended to allow cross-designation, it has written a provision expressly allowing cross-designation.

Another compelling reason against reading cross-designation authority into Title 21 (and into § 873(b) specifically) is that where Congress has intended to allow cross-designation, Congress has so written. For instance, 8 U.S.C. § 1103—the section determining who may enforce federal immigration laws—provides that the Attorney General "may require or authorize *any employee of ... the Department of Justice* to perform or exercise any of the powers, privileges, or duties" relating to the enforcement of immigration laws under Chapter 12, Title 8. 8 U.S.C. § 1103(a)(4) (emphasis added). Accordingly, the Attorney General may authorize any employee of the Department of Justice to enforce immigration law. Similarly, Congress has provided for the cross-designation of Border Patrol agents as U.S. Customs officers by the Secretary of the Treasury. Section 1401(i) of Title 19 defines "customs officers" to include "any agent or other person authorized by law or designated by the Secretary of the Treasury to perform duties of an officer of the Customs Service." 19 U.S.C. § 1401(i). Additionally, § 1581(b) allows "[o]fficers of the Department of the Treasury and *other persons authorized* by such department" to board vessels in order to enforce navigation laws under the authority of the U.S. Customs. 19 U.S.C. § 1581(b) (emphasis added). Courts have expressly found that pursuant to 19 U.S.C. §§ 1401(i) & 1581(b) Border Patrol agents have been properly cross-designated by the Secretary of Trea-

sury with authority to enforce U.S. Customs laws and to act as U.S. Customs agents and inspectors. *See United States v. Thompson*, 475 F.2d 1359, 1362–63 (5th Cir.1973); *United States v. Settles*, 481 F.2d 1272, 1273 (5th Cir.1973); H.R.Con. Res. 122, 106th Cong., 145 Cong.Rec. H11922–01 (1999) (enacted). Title 21, however, lacks any remotely similar provision allowing for the designation of federal agents with the authority to enforce federal narcotics laws.

For the above reasons, the Court holds that the Attorney General may not confer upon the Border Patrol the authority to enforce federal narcotics laws beyond the authority already granted by 8 U.S.C. § 1357(a)(5). Put another way, the Attorney General lacks the authority to remove the limiting condition of § 1357(a)(5)—that is, that a Border Patrol agent may make an arrest for a non-immigration law felony only if the agent is *performing duties relating to the enforcement of the immigration laws at the time of the arrest* and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(5). As a corollary, Border Patrol agents may not conduct a roving patrol stop based solely on a suspicion of a violation of a federal narcotics law.

This Court is aware that the Border Patrol has had to assume the additional duty of policing the border for the smuggling of illegal narcotics. In fact, a House Resolution recognizing the Border Patrol's seventy-five years of service recognized that "with the increase in drug-smuggling operations, the Border Patrol has also been assigned additional interdiction duties, and is the primary agency responsible for drug interdiction between ports-of-entry." H.R.Con.Res. 122, 106th Cong., 145 Cong.Rec. H11922–01 (1999). The importance of the Border Patrol in this new

role is evidenced by the tremendous increase in seizures of narcotics by the Border Patrol in recent years. For instance, at the Sierra Blanca checkpoint alone, the quantity of marihuana seized has more than doubled from 1996 to 24,807 pounds in 1999. And this is only one of the areas where the Border Patrol operates.

However, the Court is equally aware that the Attorney General has expanded the Border Patrol's arrest power beyond the limits established by Congress under 8 U.S.C. § 1357(a). It is a cause for concern that Border Patrol agents, wearing Border Patrol uniforms and displaying only the outward authority of the INS, are acting as DEA agents and enforcing federal narcotics laws. The cross-designation of federal agents leaves citizens, who are stopped by such dual authority agents, with no real way of knowing the limits of the agents' authority. This raises serious constitutional concerns since the discovery of narcotics by Border Patrol agents is frequently the direct result of the owner consenting to a search of the vehicle. Though the tremendous increase in drug smuggling makes expanding Border Patrol's authority a sound and prudent legislative decision, courts cannot rewrite the statutes.

### C. Authority of Border Patrol agents under Texas citizen's arrest statutes

■ In the absence of codified authority under 8 U.S.C. § 1357(a)(5), the Court must also consider Border Patrol agents' authority to effectuate a stop under the Texas citizen's arrest statute. This statute allows a private citizen to arrest someone for a felony or a breach of the peace that is "committed in his presence or within his view." Tex.Code.Crim.Proc.Ann. art. 14.01(a) (Vernon 1977). Agents Mooreland and McConnell retained their citizen's arrest power even though they acted in their capacity as Border Patrol agents. *See*

*Sealed Juvenile 1,* 255 F.3d at 217. However, merely having a reasonable suspicion that a vehicle is smuggling narcotics does not meet the requirement that the offense be "committed in his presence or within his view." Otherwise, citizens would be allowed to make citizen's arrests based on reasonable suspicions of felonious activity rather than actual knowledge.

### D. The Border Patrol agents did not have a reasonable suspicion that Perkins's RV was involved in a violation of an immigration law.

The final question in this complex analysis is whether the Border Patrol agents were aware of specific, articulable facts, considering the inferences rationally drawn from those facts, that reasonably warrant a suspicion that Perkins's vehicle was involved in a violation of immigration law. The Court finds that the facts fail to meet the reasonable suspicion test of *Brignoni–Ponce.*

### 1. The BOLO was sufficient to establish a reasonable suspicion that Perkins's RV was involved in marihuana but not alien smuggling.

■ The evidence and testimony at the hearing establish that Border Patrol agents stopped Perkins's RV based solely on the BOLO, which advised only of marihuana smuggling. The BOLO was based on a tip from a informant. This tip was not anonymous. It was from a known source that Customs Agent Upchurch believed to be reliable and credible. According to Agent Upchurch, the source had proven reliable in the past. The Court recognizes that the CI failed to provide a detailed description of the RV and its occupants, the exact location where the RV was being loaded, and the destination of the RV. The CI also failed to inform the agents that the RV was towing a small car. However, the CI knew that a loaded RV

would depart Redford by approximately 7:30 a.m. on June 15, 2000. This predictive information demonstrates that the CI had knowledge of the likelihood of criminal activity rather than only an ability to identify a specific vehicle or person. *Cf. Florida v. J.L.*, 529 U.S. 266, 271–72, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (discussing how the accuracy of descriptive information is of lesser importance than predictive information indicating a likelihood of criminal activity in determining whether an anonymous-tip may support a stop and frisk).

Therefore, the Court finds that this tip from a known and proven reliable informant with whom Customs Agents had an on-going relationship was sufficient to establish a reasonable suspicion of that the RV driven by Perkins was smuggling marihuana. *See Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *see also J.L.*, 529 U.S. at 270, 120 S.Ct. 1375 (recognizing that a "tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated" is generally sufficiently reliable to support an investigatory stop); *United States v. Gonzalez*, 190 F.3d 668, 672 (5th Cir.1999) ("[I]t is the BOLO that provides the tailoring that transforms what could be characterized as an unparticularized hunch into a reasonable suspicion.").

■ As explained above, however, the Border Patrol do not have the authority to stop a vehicle based solely on a suspicion of narcotics smuggling. The evidence and testimony at the hearing establish that the BOLO was the only reason that the Border Patrol agents stopped Perkins's RV. The BOLO advised the agents only of narcotics smuggling. In addition, no other factors establish a reasonable suspicion of an immigration law violation. Though the agents observed several loose safety straps and could have stopped the vehicle for safety reasons, the agents could not stop the vehicle to conduct an immigration inspection and/or investigatory stop based solely on the loose straps. Other than the loose straps, the RV was simply traveling on a scenic route early in the morning. This is insufficient to support a roving patrol stop for the purpose of conducting an immigration inspection.

## II. Is suppression appropriate?

### A. Suppression is not the appropriate remedy for the statutory violation

■ Having found the stop unauthorized, the next step is determining whether suppression of the evidence is the proper remedy. The exclusion of evidence is an extraordinary remedy and not every violation of a federal statute warrants the invocation of the exclusionary rule. *United States v. Butts*, 729 F.2d 1514, 1517–18 (5th Cir.1984) (emphasizing that the exclusionary rule does not per se apply to evidence uncovered as a result of illegal conduct by officers); *see also United States v. Ware*, 161 F.3d 414, 424 (6th Cir.1998) (recognizing that the exclusionary rule should be applied only where a statutory violation amounts to a denial of a constitutional right); *United States v. Hensel*, 699 F.2d 18, 29 (1st Cir.1983) ("[The] lack of statutory authority and the contravention of a regulation do not automatically invoke the exclusionary rule."). Evidence gathered in contravention of statute should be excluded only where the violation of the statute amounted to a violation of a constitutional right. *Hensel*, 699 F.2d at 29 ("The exclusionary rule was not fashioned to vindicate a broad, general right to be free of agency action not 'authorized' by law, but rather to protect certain specific, constitutionally protected rights of individuals."). "The purpose of the exclusionary rule is to deter improper police conduct

that violates a person's reasonable expectation of privacy under the Fourth Amendment." *Butts,* 729 F.2d at 1517.

■ As a general matter, an investigatory stop based on a BOLO report of narcotics smuggling does not violate the Fourth Amendment. *See, e.g., Gonzalez,* 190 F.3d at 672 (determining that a BOLO report that a specific type of vehicle was involved in narcotics smuggling was sufficient to justify an investigatory stop of that type of vehicle). For instance, an investigatory stop by DEA agents based on a reasonable suspicion of narcotics smuggling is constitutional. Here, whether the remedy of exclusion should be invoked turns on whether an otherwise constitutional investigatory stop is made unconstitutional because it was performed by Border Patrol agents, who lack the authority to make the stop.

■ Even if the Border Patrol agents had exceeded their statutory authority by stopping Perkins's vehicle, the extraordinary remedy of suppression of the marihuana found is not warranted in this case. First, the requirement of § 1357(a)(5) that Border Patrol agents be performing duties relating to the enforcement of immigration laws at the time they make an arrest is not directly connected to individual constitutional rights. Instead, this condition was designed primarily to ensure that Border Patrol agents would not be diverted from their duty of enforcing immigration laws. Exclusion of the evidence discovered, as a remedy for a violation of § 1357(a)(5), would not serve this goal.

However, unauthorized investigatory stops by Border Patrol agents do raise constitutional concerns because in certain situations Border Patrol agents have the authority to make stops without warrant and without reasonable suspicion. Such is the case of seizures at fixed immigration checkpoints. Because such seizures create an exception to the constitutional requirement that a seizure be based on a reasonable suspicion, the limitations of those seizures are enforced with great care. *Martinez–Fuerte,* 428 U.S. at 566–67, 96 S.Ct. 3074 ("The principal protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop."); *cf. United States v. Harrington,* 681 F.2d 612, 614 (9th Cir.1982) (observing that because border searches create an exception to standard constitutional practices, the limits on the scope of the searches are strictly enforced).

In addition, the limitations on the arrest powers of the Border Patrol (or any other specialized federal law enforcement agency) implicate constitutional rights. In fact, defining the authority of law enforcement agents and enforcing those limitations always affects individual rights. As the Court noted above, it is troubling that Border Patrol agents, displaying only the authority of the INS, are actually enforcing narcotics laws as if they were DEA agents. This expansion is especially troubling since Border Patrol agents have the authority to effectuate seizures without warrant or probable cause at fixed checkpoints and at points of entry. These blurred lines undermine the public's ability to understand their rights when stopped by Border Patrol agents.

However, a roving patrol stop by a Border Patrol agent is also attended by the requirement that the officer be aware of specific facts that give rise to a reasonable suspicion of criminal activity. This requirement affords some protection of the Fourth Amendment interests of motorists and travelers. In the end balance, Court finds that though constitutional rights are implicated by the Border Patrol's violation of § 1357(a)(5), the remedy of exclusion is not warranted in part because of other constitutional protections. In addition, the

Court finds that the need to deter future violations of § 1357(a)(5) does not yet justify suppressing the evidence discovered here.

This does not mean that investigatory stops by Border Patrol agents outside the authority of § 1357(a)(5) should continue merely because the remedy of exclusion was not granted in this case. The Court strongly emphasizes that continued roving patrol stops by Border Patrols based solely on a suspicion of narcotics smuggling would only support the argument that the remedy of exclusion is necessary to enforce the limitations of § 1357(a)(5).

### B. Good Faith Exception

■ In addition to being the improper remedy, the exclusion of the marihuana discovered in Perkins's RV is unwarranted because the Border Patrol agents were acting in good faith when they made the stop. Under the good faith exception to the exclusionary rule, "evidence is not to be suppressed under the exclusionary rule where it is discovered by officers in the course of actions that are taken in good faith and it the reasonable, though mistaken, belief that they are authorized." *United States v. Williams*, 622 F.2d 830, 840 (5th Cir.1980); *See also, e.g., United States v. Francis*, 183 F.3d 450, 452–53 (5th Cir. 1999) (affirming the current applicability of the good faith exception). The good faith exception applies to warrantless arrests. *See United States v. De Leon–Reyna*, 930 F.2d 396, 400 (5th Cir.1991).

Here, Agents Mooreland and McConnell had the good faith belief that they were authorized by their cross-designation under Title 21 to effectuate the investigatory stop of Perkins's RV based on a suspicion of narcotics smuggling rather than immigration smuggling. Indeed, under a plain reading of *Cortez* and the Fifth Circuit cases applying *Cortez*, it is entirely reasonable for Agents Mooreland and McConnell to believe that they had the authority to effectuate a roving patrol stop to investigate the possibility of narcotics smuggling. *Cortez*, 449 U.S. at 421–22, 101 S.Ct. 690 ("Rather the question is whether, based upon the whole picture, they, as experienced Border Patrol officers, could reasonably surmise that the particular vehicle they stopped was engaged in criminal activity."); *see also, e.g., United States v. Ramirez–Lujan*, 976 F.2d 930, 933 (5th Cir.1992) ("Border officers on roving patrol may stop a vehicle only if they are aware of specific articulable facts that create a reasonable suspicion that the vehicle contains illegal aliens or drugs.").

In addition, a few courts have acknowledged, if only in passing, that Border Patrol agents are cross-designated to enforce narcotics laws. *Soto–Camacho*, 58 F.3d at 410 (acknowledging that Border Patrol agents are "cross-designated as drug enforcement and customs agents, and are trained to detect drug smuggling as well as alien smuggling"); *de La Rosa–Valenzuela*, 993 F.Supp. at 468 (stating the scope in which United States Border Patrol agents are authorized to enforce narcotics laws as a result of their cross-designation by the Attorney General pursuant to 21 U.S.C. §§ 873(b) & 965).

Therefore, the Court finds that Agents Mooreland and McConnell were acting in good faith when they stopped Perkins's vehicle. In addition, their good faith was objectively reasonable in light of case law and the Attorney General's cross-designation allowing Border Patrol agents to conduct investigatory stops based solely on suspicions of narcotics violations, even though the Court has now found the cross-designation unlawful.

The Court, however, emphasizes that future roving patrol stops by Border Patrol agents based solely on a suspicion of narcotics smuggling will not be protected by the good faith doctrine.

### III. The Search of Perkins's RV

A search of a vehicle at a checkpoint must be supported by consent or probable cause. *See United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975). Law enforcement officers, without warrant or probable cause, may conduct a search if the individual voluntarily consents to the search. *See United States v. Brown*, 102 F.3d 1390, 1395 (5th Cir.1996). The primary inquiry here is whether the defendant's consent to the search is truly voluntary. *Id.* at 1396. Voluntariness is a question of fact to be determined by the totality of the circumstances. *Id.* When the government relies on the consent of the defendant to justify the lawfulness of a warrantless, suspicionless search, it has the burden of proving, by the preponderance of the evidence, that the consent was freely and voluntarily given. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 221, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Hurtado*, 905 F.2d 74, 76 (5th Cir.1990) (holding that the government need only prove that voluntary consent was given by the preponderance of the evidence).

#### 1. Was Perkins's consent voluntary?

■ The factors considered by the Court in determining voluntariness include: (1) the individual's knowledge of his constitutional right to refuse consent; (2) the age, intelligence, education, and language ability of the individual; (3) the degree to which the individual cooperates with police; (4) the person's apparent attitude about the likelihood of discovery of contraband items; and (5) the level and degree of coercive police behavior as evidenced by the length of detention and the nature of questioning. *See Brown*, 102 F.3d at 1396. This list of factors is not exhaustive and no single factor is per se dispositive. *Id.*

In this case, Agent McConnell testified that he identified himself as a Border Patrol agent and asked Perkins his citizenship status and several questions concerning his travel plans. It was at this time that Agent McConnell asked Defendant Perkins if he could look in the RV. Agent McConnell testified that Perkins consented. However, Agent McConnell did not immediately look into the RV. Instead, he asked Defendant Perkins to step to the rear of the RV and to reattach the safety tow straps with the assistance of Agent McConnell's partner. Agent McConnell then asked the passenger (Perkins's spouse) to exit the vehicle and to go to the rear of the RV. Agent McConnell then testified that he again asked consent to search the RV from both Defendant Perkins and the passenger. He also asked if the side door was unlocked. According to Agent McConnell, Perkins said that the door was unlocked and once again consented to the search of the RV. Upon boarding the RV, Agent McConnell observed the sugar sacks in open view, which later turned out to secret bundles of marihuana.

Agent Mooreland, the other Border Patrol agent present during the stop, corroborated Agent McConnell's testimony. Defendant Perkins and his spouse, however, testified to the contrary. Defendant Perkins testified that the agents never asked for consent to search the RV. Perkins's wife also testified that she never actually heard either agent ask for consent to search the RV. However, Perkins's wife testified that she was both extremely scared at the time and on prescription medication for anxiety. In fact, Agent McConnell observed that her jaw was visibly shaking during his initial questioning of Perkins. Both her fear and medication affected her ability to remember and recall the events that took place. The issue of whether consent was validly given turns on the credibility of the witnesses.

The Court notes that at no time during this encounter was Perkins told of his right to refuse consent to the requested search (the first factor). The Supreme Court has found that knowledge of the right to refuse is not required for a defendant's consent to be voluntary. *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (citation omitted) ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent."). The Supreme Court has also found that the advisement to a defendant by police of his right to refuse is particularly significant in determining the issue of voluntariness. *See Florida v. Bostick*, 501 U.S. 429, 432, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (emphasizing that police specifically advised the defendant of his right to refuse consent in determining whether a reasonable person would feel free to decline the officer's request or to otherwise terminate the encounter); *Muniz–Melchor*, 894 F.2d at 1440 (citation omitted) (recognizing that though knowledge of the right to refuse is not a requirement for a finding of voluntary consent, it is a "central factor in any voluntariness analysis"). A simple advisement of the right not to consent would make it much easier for this Court to find valid consent, especially where as here Border Patrol agents, acting under the outward authority of the INS, are actually acting under the authority of the DEA.

In light of the evidence admitted at trial, the Court finds that Perkins gave his valid, voluntary consent to the search of his RV.

## CONCLUSION

This is a difficult case in an exceedingly complicated body of law. The statutes defining the authority of the Border Patrol simply do not reflect nor adequately accommodate the significant role the Border Patrol now plays in the apprehension of narcotics smuggling. However, the courts cannot rewrite the statutes.

It is useful, in concluding, to recapitulate this Court's findings and conclusions. Border Patrol agents did not have the authority to stop Perkins's RV for the purpose of investigating a suspicion of narcotics smuggling. The Attorney General does not have the authority to cross-designate Border Patrol agents with Title 21 arrest powers. In addition, the Court finds that the Border Patrol agents did not have articulable facts that reasonably warrant suspicion that the RV was being used to violate immigration laws. However, though the Border Patrol agents did not have the authority under § 1357(a)(5) to make the stop, suppression is the improper remedy. In addition, the agents had a good faith belief, which was objectively reasonable, that they had authority to conduct an investigatory stop based solely on a suspicion of narcotics smuggling. Finally, this Court finds that Perkins's consent to the search of his RV was validly obtained.

Again, the Court emphasizes that under § 1357(a)(5), a Border Patrol agent may make an arrest for a narcotics felony only if he is performing duties relating to the enforcement of immigration laws at the time the arrest is made. As a corollary, Border Patrol agents may not make a roving patrol stop based solely on a reasonable suspicion of a non-immigration law violation.

It is therefore ORDERED that the Defendant's Motion to Suppress be DENIED.